LUTHER ANDERSON, *et al.*,                                     PLAINTIFFS

v.

JACK LINGENFELTER, in his individual
capacity, *et al.*,                                           DEFENDANTS

## MEMORANDUM OPINION

This matter comes before the Court on two motions for summary judgment by Defendants. First, Defendants Jack Lingenfelter ("Officer Lingenfelter") and the City of Hopkinsville have filed a Motion for Summary Judgment, (DN 35), to which Plaintiffs have responded, (DN 37), and those Defendants have replied (DN 42). The City of Oak Grove has filed a separate Motion for Summary Judgment, (DN 36). Plaintiffs have responded, (DN 38), and the City of Oak Grove has replied, (DN 43). These matters are now ripe for adjudication. For the following reasons, Defendants' Motions are GRANTED on the Plaintiffs' federal cause of action, while the state law claims are REMANDED to the Circuit Court of Christian County, Kentucky.

## BACKGROUND

This lawsuit involves two searches of retail establishments in the cities of Hopkinsville and Oak Grove led by the Hopkinsville Police Department ("HPD") in late April 2012. On April 24, 2012, at 206 North Drive in Hopkinsville, the HPD searched the retail establishments Pizza

Roma and Sunkissed Tanning.[1] Thereafter, on April 25, 2012, the HPD and two members of the Oak Grove Police Department participated in a search of a retail store called The ToyBox, located at 15708 Fort Campbell Boulevard in Oak Grove.[2] Plaintiff Anderson Investment Company ("AIC"), of which fellow plaintiff Luther Anderson ("Anderson" or "Luther") is a corporate officer and the sole shareholder, operated each of these businesses at the time of the searches. The following facts are mostly undisputed, with any factual inferences drawn in Plaintiffs' favor.

### I. April 24, 2012: Initial Search of Pizza Roma

On April 24, 2012, two HPD officers arrived at Pizza Roma soon after teenage employees Keandra Anderson[3] and Katie Kitchens had begun their afterschool shift. (K. Anderson Dep. 11:1-9, Mar. 29, 2013, DN 35-3; K. Kitchens Dep. 6:24-7:2, Mar. 29, 2013, DN 35-4.) When the officers[4] informed the teens they had a complaint about herbal incense being sold at the business, Keandra denied any such knowledge. (K. Anderson Dep. 16:1-7.) However, Keandra overheard Kitchens tell the police that Luther had sold synthetic drugs from Pizza Roma when it was legal to do so. (*Id.* 16:22-17:13.) The officers then "asked if they could look around." (*Id.* 14:20.)

---

[1] Though Pizza Roma and Sunkissed Tanning operate as two separate businesses, the establishments share employees and there is no physical separation between the two businesses. In the interest of brevity and clarity, the Court will refer to the premises collectively as "Pizza Roma."

[2] According to Plaintiffs' Complaint, The ToyBox:

> offer[s] for sale a wide variety of merchandise, including *inter alia*, motion picture DVDs and videos, magazines, sex-related novelty items, gifts and toys, lingerie, lotions, lubricants, bath products, fragrances and incenses. The business also offers for sale a wide variety of loose tobacco and tobacco products, pipes and smoking instruments and accessories, all of which are designed to ingest or consume tobacco and are marketed for that purpose.

Pls.' Compl. ¶ 19.

[3] Keandra is Luther Anderson's 17-year-old niece. For clarity, the Court refers to her as "Keandra."

[4] Keandra recalls that the officers involved in this initial questioning were Officer Lingenfelter, who is named individually as a defendant in this case, and Officer Sears.

Keandra told them they could and accompanied the officers around the premises. (*Id.* 14:23-15:4; *see also* Kitchens Dep. 14:9-12 (confirming that officers requested permission to look around and Keandra's assent.))

After leading the officers to the businesses' office, Keandra called the Pizza Roma's manager, Sarah Anderson, and told her that the police were there.[5] Sarah called Luther, who in turn called the store and told Keandra to tell the officers to leave the premises. (K. Anderson Dep. 22:14-15.) Keandra found the officers in a storage room and gave Officer Sears the phone, who told Luther that the police could not leave the premises. (*Id.* 23:5; 24:10-18.)

After Luther's first phone call, the officers asked Keandra for permission to open boxes in the storage room, and she declined. (*Id.* 25:11-12.) The officers did not open the boxes, but remained in the storage room and "waited around." (*Id.* 25:14-15.) Luther called a second time and spoke with officers again, who again replied they could not leave the premises because they had a lead about incense. (*Id.* 26:2-27:2.) After the second phone call, the officers went to their vehicles and returned with a consent form, which they had Keandra sign to document her consent to the initial search. (*Id.* 27:4-28:21; *see also* Consent to Search Form, Defs.' Ex. D, DN 35-5.)

## II.     April 24, 2012: The Pizza Roma Search Warrant

While Officer Sears and other HPD police officers remained at the Pizza Roma premises, Officer Lingenfelter obtained a search warrant. In his affidavit requesting a search warrant, Officer Lingenfelter avers that after receiving a tip from a fellow officer that synthetic drugs were being sold illegally at Pizza Roma, he went to the business to further investigate. (Aff. for Search Warrant, Defs.' Ex. E, DN 35-6.) Officer Lingenfelter recounts that an employee stated that the establishment had previously sold synthetic drugs before state law was revised to

---

[5] Sarah Anderson is Keandra's stepmother and Luther Anderson's sister-in-law. For clarity, the Court refers to her as "Sarah."

prohibit them and gave him consent to walk around the business. (*Id.*) Upon entry into a storage room, Officer Lingenfelter observed "approximately forty (40) cardboard boxes", one of which was labeled "Union Crafts." (*Id.*) An internet search revealed that Union Crafts "sells pipes commonly used with the ingestion of illegal narcotics." (*Id.*) Officer Lingenfelter's request to open the boxes was rebuffed, and he then learned the owner of the business was Luther Anderson, who Officer Lingenfelter knew owned The ToyBox, "a business that recently was a retailer of synthetic narcotics." (*Id.*) Officer Lingenfelter cited the above facts as probable cause for issuance of a search warrant, as well as his "knowledge and experience into the investigation of narcotics trafficking," and that "the existence of these boxes in a business that participates in tanning and pizza commerce could not be explained." (*Id.*)

Based on this affidavit, a search warrant issued for the Pizza Roma premises ("Pizza Roma Warrant"), authorizing the seizure of:

> the following described personal property to-wit: any controlled substances, any items that could be considered drug paraphernalia, weapons, blood, clothing, money, surveillance equipment, photographs, documents or any other property used or connected with the commission of the traffic, possession or manufacture of any controlled substance or in gang related activity[.]

(Pizza Roma Warrant, Defs.' Ex. E, DN 35-6.)

## III.    April 24, 2012: Execution of the Pizza Roma Warrant

After obtaining the Pizza Roma Warrant, Lingenfelter returned to the Pizza Roma and was present for the ensuing search. (Jack Lingenfelter Aff. ¶ 2, DN 42-1.) During the search, the HPD seized a box containing more than one thousand packages of herbal incense; forty-four boxes of glass pipes, which Plaintiffs value as worth "tens of thousands of dollars"; a box marked "Leave for Luther"; and nearly $450.00 from the business's cash register. (Evidence Record, Defs.' Ex. E, DN 35-6; Pls.' Compl. ¶¶ 47, 48, 53.)

## IV.     April 25, 2012: The ToyBox Search Warrant

Based on the items seized during their search of the Pizza Roma, the HPD obtained a search warrant for The ToyBox, located in nearby Oak Grove ("ToyBox Warrant"). The Affidavit for the ToyBox Warrant states that "numerous boxes were taken into evidence following the execution of [the Pizza Roma Warrant]. The boxes were found in a storage room at the back of the facility and contained synthetic drugs. A cardboard box labeled 'leave for Luther' was addressed to the Toy Box . . . and contained synthetic drugs. Luther Anderson owns all three businesses." (ToyBox Warrant, Defs.' Ex. H, DN 35-9.) Based on this, and the fact that Pizza Roma employees denied selling synthetic drugs on the Pizza Roma premises, Officer Lingenfelter requested a search warrant.

The warrant, issued April 25, 2012, authorized the seizure of "any synthetic drugs or other contraband, along with any business records which show when the materials were ordered, when they were shipped, when they were received, and when they were sold." (*Id.*)

## V.     April 25, 2012: Execution of the ToyBox Warrant and the Search of Jessica Long

With Officer Lingenfelter "in charge", the HPD arrived at Anderson's business, The ToyBox, to execute the search. (Pls.' Compl. ¶ 67.) Because The ToyBox is located in Oak Grove, Oak Grove police officers Ryan Perry and Samuel Suiter were dispatched to assist. (Perry Aff. ¶ 3; Suiter Aff. ¶ 3; Pls.' Compl. ¶ 59.) When the police arrived at The ToyBox, Plaintiff Jessica Long ("Long") was the only employee on duty.[6] HPD displayed the search warrant to Long, who faxed it to the business's lawyer. (Jessica Long Dep. 32:4-9, Mar. 5, 2013, DN 42-4.) The Oak Grove officers, who were there for security, did not review the warrant. (Perry Aff. ¶¶ 4-6; Suiter Aff. ¶¶ 4-6; Long Dep. 76:8-10 (believed Oak Grove was there for security.)) One of

---

[6] Long is the manager of The ToyBox and Anderson's girlfriend.

the Hopkinsville officers then told Long to sit on a stool in the middle of the store. (Long Dep. 38:21.) When her attorney arrived, Long was not allowed to speak to him. (*Id.* 39:24-40:22.)

While the HPD searched the premises, the Oak Grove officers remained with Long. After an HPD officer noticed her on the phone with Luther, an Oak Grove police officer grabbed the phone from her hand and hung it up. (*Id.* 51:23-52:6.) When Long then attempted to use her personal cell phone, an Oak Grove officer forcibly removed it from her hands and would not allow her to use it while on the premises. (*Id.* 48:14-49:14; 52:8-53:1.) Long's personal belongings[7] were also searched three times. First, an Oak Grove officer searched her belongings when the police initially arrived on the premises. (*Id.* 46:19-22.) Long did not give permission for the search. (*Id.* 46:22-24.) At some point, an Oak Grove officer searched Long a second time before escorting her outside so that she could smoke. (*Id.* 46:25-47:14.) Finally, an unidentified officer searched Long's belongings before allowing her to permanently leave the premises.

The Evidence Record reflects that the following items were seized during the HPD's search of The ToyBox: several boxes, bags, and bottles of both bills and coins totaling more than fifty thousand dollars; a "box of synthetic drugs"; boxes of incense; various pipes, bongs, and other smoking accessories, which Plaintiffs value at more than ten thousand dollars; two safes; and boxes of paperwork. (Evidence Record, Defs.' Ex. H, DN 35-9.) Plaintiffs also allege that the HPD also seized video surveillance and computer equipment, display cases, and lingerie. (Pls.' Compl. ¶¶ 87, 89, 95, 99.)[8]

On May 2, 2012, Anderson, AIC, and Long filed suit in Christian Circuit Court against Officer Lingenfelter in his individual capacity and the cities of Hopkinsville and Oak Grove,

---

[7] These personal belongings include a purse, a jacket that she was not wearing, and a lunch box.
[8] Officer Lingenfelter acknowledges that officers seized video surveillance and computer equipment and display cases containing items believed to be related to synthetic drugs or paraphernalia. He denies that any lingerie was seized. (Lingenfelter Aff. ¶¶ 4-5, 8-9.)

both municipal corporations. Against Officer Lingenfelter,[9] Plaintiffs pursue violations of their constitutional rights under the Fourth Amendment pursuant to 42 U.S.C. § 1983 and under § 10 of the Kentucky Constitution.[10] Citing Ky. Rev. Stat. § 65.2001, Plaintiffs also seek to hold Hopkinsville and Oak Grove "vicariously liable for torts committed by its employees."[11] (Pls.' Compl. ¶ 9.) This action was subsequently removed to this Court on May 21, 2012. On May 10, 2013, Officer Lingenfelter and the City of Hopkinsville moved for summary judgment. Shortly after, on May 17, 2013, the City of Oak Grove filed a separate motion for summary judgment. Officer Lingenfelter argues that he is entitled to qualified immunity while both municipalities argue there is no basis for municipal liability under the facts presented.

## STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party

---

[9] Though Plaintiffs' Complaint expressed an intention to amend their Complaint to name additional officers as defendants after engaging in discovery, they have not done so to date. (Pls.' Compl ¶ 14.)

[10] Plaintiffs note that Kentucky courts interpret the protections of Ky. Const. § 10 coextensively with those of the Fourth Amendment. *See*, *e.g.*, *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566 n.5 (6th Cir. 2002) (citing *LaFollette v. Commonwealth*, 915 S.W.2d 747, 748 (Ky. 1996). However, as the Kentucky Court of Appeals has recognized, "[t]here is no judicially or legislatively created private cause of action (analogous to a federal 42 U.S.C. § 1983 action) which enables an individual to seek damages for violations of [section 10 of the Kentucky Constitution]." *Jones v. Witt*, 2008 WL 612361, *3 (Ky. Ct. App. Mar. 7, 2008).

[11] Plaintiffs do not assert municipal liability claims under § 1983. Though their Complaint indicated they would engage in discovery as to whether the officers' actions were in furtherance of a municipal policy or custom, Plaintiffs have since abandoned this issue.

bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### I.    Qualified Immunity

First, Officer Lingenfelter argues he is entitled to qualified immunity because he did not violate clearly established law. Qualified immunity shields government officials from civil liability for discretionary functions, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* To balance these interests,"[t]he standard is one of objective reasonableness, analyzing claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant['s] position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Denton v. Rievley*, 353 F. App'x 1, 4 (6th Cir.

2009) (alteration in original) (quoting *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995)).

The Sixth Circuit has established a three-step inquiry for analyzing whether a defendant is entitled to qualified immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Merriweather v. Zamora*, 569 F.3d 307, 315 (6th Cir. 2009) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)). The sequence of the Court's inquiry is not mandatory. *Pearson*, 555 U.S. at 235-36. The Court addresses the issues as framed and organized by the parties in their motions and responses.

## A. Initial, Pre-Warrant "Look Around" of Pizza Roma

In their Complaint, Plaintiffs take issue with the HPD's initial look through the Pizza Roma premises, alleging that "any purported consent was involuntary as the product of coercion and because police, having been told in no uncertain terms by the operator of the business, were trespassers on the premises when any purported consent was obtained." (Pls.' Compl. ¶ 30.) In his motion for summary judgment, Officer Lingenfelter notes that officers received verbal consent to search from Keandra Anderson, who then gave them a tour of the premises. It is well-settled that one of the specifically established exceptions to the requirements of the Fourth Amendment is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In their response, Plaintiffs do not address this argument, and instead focus their attention on other aspects of the two searches and seizures.

Because it appears that Plaintiffs have abandoned their allegations that this initial search was unlawful, the Court will not conduct a full analysis of the issue. However, upon brief review, it appears Officer Lingenfelter's reliance on Keandra's consent was not unreasonable and, therefore, not constitutionally impermissible. *See United States v. Grigsby*, 367 F. Supp. 900, 902 (E.D. Ky. 1973) (quoting *Frazier v. Cupp*, 394 U.S. 731 (1969)) ("The employer, in allowing the employee to use the premises under the circumstances here, must "be taken to have assumed the risk that. . . [she] would allow some one else to look inside.") Furthermore, it is well-settled that "an officer does not violate the Fourth Amendment by securing the area to be searched and waiting until a warrant is obtained." *United States v. Taylor*, 248 F.3d 506, 513 (6th Cir. 2001) (citing *Segura v. United States*, 468 U.S. 796, 810 (1984)). Because the conduct of Officer Lingenfelter and his fellow officers during this initial look around was constitutionally permissible, Defendants are entitled to summary judgment on this issue.

### B.  The Pizza Roma Warrant and Its Execution

Although Plaintiffs' Complaint alleges that the Pizza Roma Warrant was "constitutionally infirm", they have abandoned this line of reasoning in their subsequent briefing, instead contending only that the ToyBox Warrant was facially invalid. Plaintiffs continue to maintain, however, that HPD officers' execution of both the search warrants was improper—specifically that officers "disregard[ed] and exceed[ed] the minimal limitations" of the warrants by seizing cash and merchandise not authorized under the warrant. (Pls.' Resp., 14, DN 37.) Officer Lingenfelter and the City of Hopkinsville contend that all the items seized from the Pizza Roma were within the scope of the warrant, and, alternatively, that if any items seized were not in the scope, Officer Lingenfelter is nonetheless entitled to qualified immunity.

Again, the Pizza Roma warrant authorized the seizure of:

any controlled substances, any items that could be considered drug paraphernalia, weapons, blood, clothing, money, surveillance equipment, photographs, documents or any other property used or connected with the commission of the traffic, possession or manufacture of any controlled substance or in gang related activity[.]

(DN 35-6.) During the Pizza Roma search, officers seized from the premises a box containing packages of herbal incense, forty-four boxes of glass pipes, a box marked "Leave for Luther," and nearly $450.00 from the businesses' cash register.

In their response, Plaintiffs argue that "[i]n each [search], police seized and removed from the premises tens of thousands of dollars' worth of cash and/or merchandise not authorized under the express limitations of the warrant." The money clearly fell under the express scope of the warrant. *See Marcilis v. Twp. of Redford*, 693 F.3d 589, 601-02 (6th Cir. 2012) (upholding warrant that authorized seizure of money in suspected drug trafficking case); *United States v. Lengen*, 245 F. App'x 426 (6th Cir. 2007) (same); *see also United States v. $110,873.00 in U.S. Currency*, 159 F. App'x 649, 652 (6th Cir. 2005) (holding officers' seizure of money after arresting defendant for possession of marijuana during a traffic stop).

Plaintiffs argue the incense and glass pipes, which they classify as "tobacco smoking accessories," were not controlled substances or drug paraphernalia. However, based on the facts of the case, the officers could have reasonably believed those items were synthetic drugs or used in connection with the possession or traffic of synthetic drugs, especially in light of the fact some of their boxes were labeled as from a known seller of drug paraphernalia. Therefore, Officer Lingenfelter's and his fellow officers' seizure of these items was objectively reasonable. Officer Ligenfelter is entitled to qualified immunity for the search and seizure of items from the Pizza Roma.

### C. The ToyBox Warrant

Plaintiffs maintain that the search warrant for The ToyBox premises is facially invalid because it fails to comport with the Fourth Amendment's particularity requirement. The Fourth Amendment to the United States Constitution requires that a warrant describe with "particular[ity] ... the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. "However, the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought" and a warrant will be "valid if it is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988).

Here the warrant directed officers to seize "any synthetic drugs or other contraband, along with any business records which show when the materials were ordered, when they were shipped, when they were received, and when they were sold." (DN 35-9.) Plaintiff takes issue with this directive, arguing that a command to seize synthetic drugs or other contraband "provides no guidance to executing officers." (Pls.' Resp. at 12.) In support of this contention, Plaintiffs cite *Crum v. Commonwealth*, 223 S.W.3d 109 (Ky. 2007), where the Kentucky Supreme Court held that a search warrant describing the thing to be seized as "illegal contraband" failed to satisfy the particularity requirement.

The Court finds *Crum* distinguishable. There, although an officer learned from an informant that the defendant was selling marijuana, the officer described the items to be seized only as "illegal contraband," which, as the state court pointed out, "can be any number of things." *Id.* at 112. The court noted that the breadth of the warrant was underscored by the fact that the officer checked every box on the affidavit form, "including one which indicated he was looking for

stolen property." *Id.* By contrast, here Officer Lingenfelter's affidavit[12] specifies that he seeks a warrant to search "any fixture, item or container which could be used to contain or conceal synthetic drugs or other contraband, along with any business records which show when the materials were ordered, when they were shipped, when they were received, and when they were sold." (DN 35-9.) The Affidavit further indicates that because officers seized synthetic drugs and a box that said "Leave for Luther" from the Pizza Roma, employees asserted that they did not sell the drugs at the Pizza Roma, and Luther Anderson owned both the Pizza Roma and The ToyBox and had sold synthetic drugs at The ToyBox before they were outlawed, he believed officers would find synthetic drugs at The ToyBox. For these reasons, *Crum* does not inform the Court's analysis.

Here, the Court finds that at the very least, it was objectively reasonable for Officer Lingenfelter to rely on the search warrant. The term "other contraband" immediately follows a reference to synthetic drugs and precedes a reference to records related to such "materials." Based on the context in which the search warrant was sought, the Court does not find the language of the warrant was so broad that it was unreasonable for Officer Lingenfelter to rely on it in conducting a search of The ToyBox.

### D. The Scope of The ToyBox Search

Plaintiffs next argue that even if the ToyBox Warrant is valid, Officer Lingenfelter and his fellow officers went beyond the scope of the warrant by seizing currency, lingerie, computer equipment, video equipment, display cases, safes, "tobacco pipes" and other smoking

---

[12] The Court may properly consider Officer Lingenfelter's affidavit: the warrant explicitly incorporated the supporting affidavit and the issuing judge signed both the affidavit and warrant. *See Baranski v. Fifteen Unknown Agents of Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 440 (6th Cir. 2006) (considering affidavit in similar circumstances).

accessories, and lingerie. "A valid search warrant can become an invalid search if officers flagrantly disregard the limitations of the warrant." *Brindley v. Best*, 192 F.3d 525, 531 (6th Cir. 1999). "Such action violates the Fourth Amendment" and "[t]he test is whether the officer's actions were reasonable." *Id.* The Court will examine each of the items seized in turn.

1. Incense Products

The Court is unsure from Plaintiffs' Response whether they contest the seizure of incense officers believed to be synthetic drugs. Kentucky law defines synthetic drugs with reference to their chemical composition. *See* Ky. Rev. Stat. § 218.010. Therefore it would be untenable, or rather an impossibility, to restrict officers to seizing only those substances they could readily identify as synthetic drugs. The Court finds the HPD's seizure of these products for laboratory testing did not exceed the scope of the warrant, as they reasonably suspected they constituted synthetic drugs.

2. Glass Pipes

Plaintiffs argue that tobacco pipes cannot sensibly be considered "synthetic drugs or other contraband." The Court agrees with Officer Lingenfelter, who notes that it was reasonable for him "to believe that the glass pipes, found with bongs, grinders, scales, baggies, screens, rolling papers, 'one hitters,' and similar items, at least of some of which were labeled from a known seller of drug paraphernalia, were not going to be used to smoke tobacco." (Defs.' Reply, 6, DN 42.) Because it was reasonable for officers to seize such items, including the pipes, as contraband, Officer Lingenfelter is entitled to qualified immunity regarding their seizure.

### 3. Video and Computer Equipment

In his affidavit, Officer Lingenfelter avers that Plaintiff Long "indicated that the video filmed by the mounted cameras was captured and stored in the computer equipment." (Lingenfelter Aff. ¶ 5.) The Sixth Circuit has upheld the seizure of a computer and subsequent search of a computer off-site, *Guest v. Leis*, 255 F.3d 325, 335 (6th Cir. 2001), as have fellow district courts. *See United States v. Kernell*, 2010 WL 1491873 (E.D. Tenn. Mar. 31, 2010) (collecting cases in other circuits); *see also United States v. Stabile*, 633 F.3d 219, 234 (3d Cir. 2011) (noting that the "practical realities of computer investigations preclude on-site searches"). Furthermore, the Sixth Circuit has also held that "even evidence not described in a search warrant may be seized if it is reasonably related to the offense which formed the basis for the search warrant." *Marcilis*, 693 F.3d at 601-02 (quoting *United States v. Wright*, 343 F.3d 849, 863 (6th Cir. 2003)).

In light of the above precedent, Long's statement that the video equipment's files were stored on the computer, and the warrant affidavit's reference to "property or things consisting of evidence which tends to show a crime has been committed or a particular person has committed a crime", the Court concludes that Officer Lingenfelter's seizure of the equipment was objectively reasonable and he is entitled to qualified immunity in this respect. *See United States v. Savoy*, 280 F. App'x 504, 511 (6th Cir. 2008) (seizure of videotapes that officers believed at the scene contained information described in search warrant was not unconstitutional).

### 4. Safes and Display Cases

HPD officers also seized two safes and small display cases during their search of The ToyBox. (Pls.' Compl. ¶¶ 91, 99.) The ToyBox Warrant's accompanying affidavit, which was

incorporated by reference and signed by the issuing judge, specifically describes "any fixture, item or container which could be used to contain or conceal synthetic drugs or other contraband."

Plaintiffs do not appear to take issue with the *search* of the safes and display cases. *See Lengen*, 245 F. App'x at 434 ("[J]udicial authorization to search a home for contraband drugs, money associated with drug trafficking, and drug paraphernalia would clearly justify the opening of doors, closets, drawers, safes, and other places where the listed items could be hidden"). However, the Court finds the officers' *seizure* of the safes and display cases to be proper as well. First, the warrant's affidavit specifically references fixtures or containers containing synthetic drugs or contraband. Secondly, the Sixth Circuit has upheld the seizure of a container with numerous items for off-site inventorying. *United States v. Blakeney*, 942 F.2d 1001, 1028 n.13 (upholding seizure of briefcase containing a "tremendous amount of paperwork and other items" and noting that "[w]here circumstances, such as these, make it impracticable to inventory and record at the site of the search . . . the seizure of irrelevant items within the suitcase along with the relevant items does not violate the fourth amendment, provided the irrelevant items are returned"). Because the Court finds the seizure of the safes and display cases to be constitutionally sound and the officers' conduct objectively reasonable, Officer Lingenfelter is entitled to qualified immunity for the seizure of these items as well.

5. Cash

During its search of The ToyBox, the HPD also seized a "box" of money containing nearly fifty thousand dollars, two water cooler bottles filled with change, a "Zales bag with change", and "money" totaling roughly $1600. (DN 35-9.) Unlike the Pizza Roma warrant, the ToyBox warrant did not specifically enumerate currency, but authorized the seizure of "any synthetic drugs or other contraband." (*Id.*) Officer Lingenfelter indicates that he believed the

currency included the proceeds of illegal drug sales and was therefore in the scope of the warrant. (Lingenfelter Aff. ¶ 6.) Again, "even evidence not described in a search warrant may be seized if it is reasonably related to the offense which formed the basis for the search warrant." *Marcilis*, 693 F.3d at 601-02. Without determining whether the seizure of the currency actually exceeded the scope of the warrant, the Court finds that Officer Lingenfelter's seizure of the money was objectively reasonable based on the facts of this case.[13] Therefore, Officer Lingenfelter is entitled to qualified immunity for the seizure of the currency.

6. Lingerie

Finally, Plaintiffs contend the HPD wrongfully seized lingerie during their search of The ToyBox. In affidavits attached to Plaintiffs' response, Anderson avers that following the search, "several items of lingerie" were missing from the premises, (Luther Anderson Aff. ¶ 25), and Long avers that "police seized a removed a substantial amount of the store's inventory of merchandise, including lingerie . . . ." (Jessica Long Aff. ¶ 20.) During his deposition, Anderson indicated that he couldn't give an "exact" estimate on what police took because the officers seized his computer, which has The ToyBox's sales records on it. (Luther Anderson Dep. 102:8-17, Mar. 5, 2013, DN 42-5.) Without those records, Anderson says he cannot determine what merchandise was taken by the HPD and which items may have sold. (*Id.* 103:18-20.)

The Defendants, on the other hand, concede that lingerie does not fall in the scope of the ToyBox Warrant, but deny that any was seized from The ToyBox. Lingerie is not included on the inventory of items seized, (DN 35-9), and Officer Lingenfelter avers that "no items from the adult novelty store were seized" and, specifically, "no lingerie or other items of clothing were

---

[13] In particular, nearly all of the currency seized was found in boxes, bottles, or bags. Based on this unorthodox storage, Officer Lingenfelter's seizure of the money as contraband was not objectively unreasonable.

seized." (Lingenfelter Aff. ¶¶ 7-8.) He also asserts that there are no items of lingerie or other clothing currently under the HPD's control. (*Id.* ¶ 9.)

The Court first notes that Anderson was not present during the search, and that Long left the premises before the search was completed. Other than stating that "several items of lingerie" were missing, Plaintiffs have never attempted to offer proof that such were missing or to be quantify this estimate. Finally, and most pertinently here, although Plaintiffs assert that lingerie was taken during the search, they offer no evidence that Officer Lingenfelter seized the lingerie. Section 1983 liability will not be imposed solely on the basis of respondeat superior. *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* Here, the list of inventory signed by Officer Lingenfelter after the search of The ToyBox does not include lingerie, and Officer Lingenfelter has no knowledge of any lingerie being removed from the premises. There is no evidence in the record that, if the lingerie was improperly removed from The ToyBox during the search, that Officer Lingenfelter "authorized, approved or knowingly acquiesced" in its removal. Therefore, Officer Lingenfelter is entitled to summary judgment in this respect as well.

### E.  Search of Jessica Long

Though Plaintiffs' Complaint takes issue with both Long's detention and the search of her personal effects, *see* Pls.' Compl. ¶¶ 68-84, Plaintiffs note in their response that "[t]he authority of police to detain Ms. Long while the search warrant was being executed is not at issue here." (Pls.' Resp. at 21.) Plaintiffs still argue, however, that the officers' search of Plaintiff Long's personal effects was improper. Plaintiffs refer the Court to *Ybarra v. Illinois*, 444 U.S. 85 (1979), for the proposition that merely being present at the premises to be searched is insufficient to give

probable cause to search that person. Specifically, the Supreme Court noted that "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91.

*Ybarra* is distinguishable. Unlike Ybarra, who was a bar patron with no connection to premises other than merely occupying it when police arrived, Long was the manager and sole employee on duty at a business suspected in engaging in the sale of synthetic drugs. Long's relationship to the premises is much less tenuous than that of Ybarra to the bar at which he was a patron. This comports with the reasoning of the Sixth Circuit's opinion in *United States v. Sissler*, which held that "[a]n item belonging to a visitor may be searched if there is a relationship between the visitor and the place." 966 F.2d 1455 (6th Cir. 1992).[14] Furthermore, to the extent Plaintiffs take issue with the fact that Long was searched three separate times, the Court finds these searches reasonable under the circumstances. The Court finds the officers' searches of Long were constitutionally sound and Officer Lingenfelter, therefore, is entitled to qualified immunity as to Long's claims against him. Plaintiffs' § 1983 claims against Officer Lingenfelter fail.

## II.    State Law Claims

Plaintiffs also seek to hold the cities of Oak Grove and Hopkinsville vicariously liable for the alleged torts of their employees, citing to Ky. Rev. Stat. § 65.2001 *et seq*., otherwise known as the Claims Against Local Government Act (CALGA). Both municipalities have moved for summary judgment on the basis that CALGA does not create a cause of action against them.

---

[14] Although this decision is unpublished and, therefore, not binding, the Court nonetheless finds it persuasive, as it comports with the rulings of other circuits. *See*, *e.g.*, *United States v. Giwa*, 831 F.2d 538, 543-45 (5th Cir. 1987) (upholding search of long-term guest's bag); *United States v. Micheli*, 487 F.2d 429, 431 (1st Cir.1973) (search of co-owner's briefcase upheld because he bore a "special relation to the place").

Plaintiffs note, however, a "municipality is immune only for torts committed in the performance of legislative or judicial or quasi-legislative or quasi-judicial functions, and can otherwise be held vicariously liable for the torts of its employees." *Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 163 (Ky. 2003) (internal citations omitted). In their response, Plaintiffs contend that the conduct of the Hopkinsville and Oak Grove police officers constitutes the tort of conversion, and seek to hold the municipalities vicariously liable. As Hopkinsville notes, Plaintiffs did not specifically allege the tort of conversion in their Complaint. Rather, they cite to CALGA and generally reference that the Defendant municipalities are vicariously liable for their officers' tortious acts, without explicitly referencing any specific tort under state law.

Because the Plaintiffs' federal claims are no longer before the Court, the Court declines to decide the remaining state law claims. Specifically, the Court has not found any wrongdoing on the part of Officer Lingenfelter and has dismissed Plaintiffs' § 1983 claims in their entirety. To the extent a cause of action for conversion remains against these Defendants, the Court declines to exercise supplemental jurisdiction. Although the district courts are granted supplemental jurisdiction under 28 U.S.C. § 1367(a), they may, in their discretion, decline to exercise that jurisdiction for the reasons listed in 28 U.S.C. § 1367(c). Specifically, a district court may decline jurisdiction over a supplemental state law claim once the court "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). The Sixth Circuit holds that "'if the federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir.1993) (quoting *Taylor v. First of Am. Bank–Wayne*, 973 F.2d 1284, 1287 (6th Cir.1992)). If a district court declines jurisdiction over a supplemental state law claim, it must dismiss the case—if an original federal action—or remand to the state court from which it was removed.

## CONCLUSION

The Defendants have moved for summary judgment on all causes of action asserted by the Plaintiffs. This matter was removed to this Court based on federal question jurisdiction because the Plaintiffs asserted a cause of action under 42 U.S.C. § 1983. For the reasons stated above, the Defendants' Motions for Summary Judgment are GRANTED on the federal cause of action. Because the Court has dismissed all federal claims, the remaining causes of action arise only under state law. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines supplemental jurisdiction over the remaining claims, and they are REMANDED to the Christian Circuit Court.

Date:

CC:      Counsel